```
 1              UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                   MARSHALL DIVISION

 3  BRUCE SAFFRAN, M.D., Ph.D.  *    Civil Docket No.
                               *    2:07-CV-451
 4  VS.                        *    Marshall, Texas
                               *
 5                             *    January 21, 2011
    JOHNSON & JOHNSON, ET A    *    9:30 A.M.
 6

 7            TRANSCRIPT OF VOIR DIRE PROCEEDINGS
             BEFORE THE HONORABLE T. JOHN WARD
 8               UNITED STATES DISTRICT JUDGE

 9  APPEARANCES:

10  FOR THE PLAINTIFFS:     MR. ERIC M. ALBRITTON
                            Albritton Law Firm
11                          P.O. Box 2649
                            Longview, TX    75606
12
                            MR. DANNY L. WILLIAMS
13                          MR. MATTHEW R. RODGERS
                            Williams Morgan & Amerson
14                          10333 Richmond Avenue, Suite 1100
                            Houston, TX    77042
15
                            MR. PAUL R. TASKIER
16                          MR. JAMES W. BRADY, JR.
                            MR. KENNETH W. BROTHERS
17                          MR. JEREMY A. CUBERT
                            MR. RYAN H. FLAX
18                          MS. KIMBERLY PARKE
                            Dickstein Shapiro
19                          1825 Eye Street NW
                            Washington,DC    20006
20
    APPEARANCES CONTINUED ON NEXT PAGE:
21

22  COURT REPORTERS:        MS. SUSAN SIMMONS, CSR
                            MS. JUDITH W. WERLINGER, CSR
23                          Official Court Reporters
                            100 East Houston, Suite 125
24                          Marshall, TX    75670
                            903/935-3868
25  (Proceedings recorded by mechanical stenography,
    transcript produced on CAT system.)
```

APPEARANCES CONTINUED:

FOR THE DEFENDANTS:  MR. GREGORY DISKANT
                     MR. SCOTT HOWARD
                     MS. IRENA ROYZMAN
                     MS. DIANA BREAUX
                     Patterson Belknap Webb & Tyler
                     1133 Avenue of the Americas
                     New York, NY   10036

                     MR. RICHARD SAYLES
                     MR. MARK STRACHAN
                     Sayles Werbner
                     1201 Elm Street
                     4400 Renaissance Tower
                     Dallas, TX   75270


              *     *     *     *     *     *     *

                   P R O C E E D I N G S

              LAW CLERK:  All rise.

              (Jury panel in.)

              THE COURT:  You can be seated.

              I want to say good morning to you again,
Ladies and Gentlemen.  I have, I guess, introduced
myself earlier.  I don't know if my ears were still red
when I came in or not.

              I know y'all were impaneled.  I apologize
to you again, but I live over in Longview.  I'm going to
give you the same information you're going to give to
everybody.  I live in Longview.  Cissy and I have been
married for 46 and had three children.  Fortunately, all

1 of our children retired to the area, and we have five

2 grandchildren.

3                 I've been on the bench for 12 years.

4 I'll be retiring in October to return to the practice of

5 law with my son.  For 31 years, I did what these lawyers

6 did.  I tried lawsuits many of them in this Court.  I

7 went to Texas Tech and then graduated from Baylor Law

8 School.

9                 And Cissy has not worked outside the home

10 since I was in law school, and she was taking care of

11 the house while I've practiced law and then done this

12 job.  I actually served on a jury one time, and I don't

13 -- I think the lawyers went to sleep, but I did serve on

14 a case many years ago in Gregg County.

15                 You've been summonsed here for jury

16 service.  I want to talk to you -- first of all, the

17 cases we're going to be picking juries in all day today

18 are civil cases.  And the United States is the only

19 country in the world that assures to their citizens and

20 participants in court a jury trial in a civil case.

21 That's by virtue of the Seventh Amendment to the

22 Constitution.

23                 And by you being here today and

24 participating, you are doing nothing less than your part

25 as ordinary citizens to preserve, protect, and defend

1 the Constitution of the United States, and in particular

2 the Seventh Amendment; that is, the right to trial by

3 jury in civil cases.

4              So what we're about is a very important

5 duty, and in this Court's view, as I've said many times,

6 it's the highest form of civil service that ordinary

7 citizens can perform for their country, save and except,

8 of course, all of those people, men and women, who serve

9 in the Armed Services.  And obviously, they are the very

10 highest form.

11             But other than -- jurors and the duties

12 that you perform are a very high form of public service

13 for your country, so I thank you for being here.

14             Now, I'm going to ask the parties here in

15 just a minute to announce in this case, but before I do,

16 I want y'all to know about the schedule, because I need

17 some information that I may need to talk about.

18             This case will actually start to trial

19 later in the afternoon.  So after we pick you, you will

20 be released to come back about -- around 3:30, those of

21 you who are selected.  And we will hear at least the

22 opening statements here this afternoon.  So we'll know

23 what the case is about.  And then we will return on

24 Monday morning next week.

25             And we work from 8:30 to 5:30 each day.

1  Now, we'll break in the morning, a lunch break, and

2  then, of course, an afternoon break, but we always try

3  to recess not later than 5:30.  And the case will take

4  the entire week, I think, to complete the evidence and

5  get a jury verdict.

6           So knowing that that is the schedule that

7  you will be required to be here all next week for the

8  trial of this case, is there anyone on the jury that has

9  a schedule problem, and that is that you've got

10 something like a medical procedure scheduled, you or an

11 immediate member of your family, or you are going to

12 be -- you have tickets that you want to fly off

13 someplace not so cold or anything -- something like

14 that?

15           If anybody's got a problem you would like

16 to talk to me -- not right now, but as soon as I get

17 your numbers, if you have a scheduling problem, raise

18 your number.

19           No. 5, 12 and 13, 18, 22 -- if you will

20 drop your numbers -- 22, 25, and 26.

21           Okay.  We will talk about that before we

22 get out of here today.

23           Now, at this time, I will ask for

24 announcements in the case of Bruce Saffran, M.D. versus

25 Johnson & Johnson and Cordis Corporation.  That's Cause

1   No. 2:07-451.

2                    What says the Plaintiff?

3                    MR. ALBRITTON:  Good morning, Your Honor.

4   Eric Albritton on behalf of Dr. Saffran, and we're

5   ready.

6                    THE COURT:  Would you please introduce

7   those people at your counsel table, Mr. Albritton, that

8   are going to be participating in this case.

9                    MR. ALBRITTON:  Yes, sir.

10                   Danny Williams from Houston, Texas, is

11  seated to my right.  Matt Rodgers also from Houston.

12  This is Mr. Curt Evans he is going to run the graphics.

13  This is Dr. Saffran, Dr. Bruce Saffran.  And this is

14  Mr. Paul Taskier.

15                   THE COURT:  Thank you, Mr. Albritton.

16                   MR. ALBRITTON:  Thank you very much, Your

17  Honor.

18                   THE COURT:  And for the Defendant?

19                   MR. SAYLES:  May it please the Court.

20  I'm Dick Sayles.  I'm counsel for Cordis Corporation and

21  Johnson & Johnson, and we are ready.

22                   Seated at the counsel table with me is

23  Mr. Greg Diskant, who will be participating in the

24  trial, and Kathleen Crotty, who will be participating in

25  the trial.  Mr. Scott Howard will be but is not in the

1  courtroom, and we will introduce him at the appropriate

2  time.

3              THE COURT:  Is that your corporate

4  representative?

5              MR. SAYLES:  No, it isn't, Your Honor.

6  The corporate rep is not here yet.

7              THE COURT:  Okay.  Thank you, Mr. Sayles.

8              Ladies and Gentlemen, this is a patent

9  infringement case, and it arises under the patent laws

10 of the United States.  Just to give you a little

11 background, the patent -- the Plaintiff in this case,

12 Dr. Saffran, was issued a patent, and he's alleging that

13 the Defendants are practicing or selling products that

14 infringe upon the patented claims.  And the Plaintiff is

15 seeking money damages against the Defendants.

16             The Defendants' position is that they do

17 not infringe the patent, and, additionally, they contend

18 that the particular claims of the patent that are

19 asserted against them in this case are invalid under the

20 patent law.

21             There's some unusual things about patent

22 cases, but one of the most unusual things, I guess at

23 least different from many other cases you might have sat

24 in, is that the jury is often called upon to apply two

25 different burdens of proof answering certain questions

1  that the Court will submit to you at the end of the

2  case.

3               One of the burdens of proof that you will

4  be asked to apply to the evidence that you hear is the

5  burden of proof by a preponderance of the evidence.

6               Now, when we speak here in Court about

7  someone having the burden of proof by a preponderance of

8  the evidence, it means that in order to meet that burden

9  of proof, you must believe that it is more likely true

10 than not true.  And in order to find that something is

11 more likely true than not true, I think it's best -- I

12 think one of the ways to explain it best is you see here

13 the statue and we've got the scales of justice.

14               The parties at this point in the case and

15 up until we start hearing evidence, they start off even.

16 But at the end of the case, after you've heard all of

17 the evidence from both sides of the case and the final

18 arguments -- final arguments from the lawyers and then

19 the final instructions, you must decide at that point in

20 the case whether the party with the burden of proof has

21 met it.

22               In order to meet that, you must start off

23 even, but at the end of it, after all the evidence, if

24 the scales tip ever so slightly in favor of the party

25 that has the burden of proof, then they have met that

1  preponderance of the evidence standard.

2              Now, additionally, I will be submitting

3  some questions to you at the close of the case, and I

4  will ask you to apply a burden of proof to certain

5  questions by a clear and convincing standard.  Now,

6  that's a more exacting burden of proof, and to be -- to

7  meet that burden of proof of clear and convincing, it

8  means that you have an abiding conviction that the truth

9  of the party's factual contentions are highly probable.

10             And if, again, we think in the terms of

11  these scales of justice, after you've heard all the

12  evidence and the arguments and the instructions of the

13  Court, in order to meet that burden of proof, the scales

14  have to tip heavier in favor of the party with the

15  burden.

16             Now, I don't want you to confuse that

17  with the burden of proof that -- undoubtedly, some of

18  you have served on juries before, perhaps in criminal

19  cases, and we all see a lot of TV, and we talk about the

20  burden of proof beyond a reasonable doubt.

21             The clear and convincing evidence

22  standard is not that high, because in the burden of

23  proof, beyond a reasonable doubt, the scales have to be

24  totally tipped in favor of the State or the Federal

25  Government in a criminal case, because someone's liberty

1  is at stake.

2           So I wanted to give you those different

3  definitions at this point in the case, because sometimes

4  the lawyers like to ask questions about applying those

5  different burdens of proof.  But those are the things

6  that you need to know now.

7           The lawyers are going to be talking to

8  you about -- in a few moments, they're going -- after

9  each one of you stood and give them this information,

10  they're going to have up to 30 minutes a side to visit

11  with you and ask you some additional questions.  Because

12  it's so important what we are about, it's very important

13  that you listen to the questions and give them complete

14  answers to the questions that they ask you.

15           I can assure you that they are not trying

16  to pry unreasonably into your private affairs or

17  anything private, but they're going to be asking you

18  questions that they need the answer to to make their

19  choices in jury selection, but it's important.

20           And it's important, as I've said, to give

21  complete answers.  But at the same time, if any of you

22  have any reason to have -- say, well, they asked for

23  something that I don't want to really share, Judge, and

24  if you've got any hesitancy, you know, there's some

25  reason you don't want to talk about it in front of

1  everyone, all you have to do is say that's something I

2  would like to talk to Judge Ward about, and we'll have a

3  chance to talk about that privately up here outside the

4  hearing.

5            I don't know if that will come up in a

6  patent case, but I have had it come up in one or two.

7  It usually doesn't, but it comes up in a lot of cases.

8  But I'll give you an example of how it comes up

9  sometimes.

10            Right after I went on the bench, oh, I

11  guess it was 10 years ago here in this courtroom, we

12  were trying a case and it was a civil case.  But it

13  involved a death that had occurred while someone was

14  incarcerated in a jail facility in one of our

15  surrounding counties.

16            And the lawyers on both sides of that

17  case necessarily and correctly were quite interested in

18  all of the potential jurors' experiences with jail

19  facilities since they were 18 years old.  We had a lot

20  of private conferences that day, because it brought up a

21  lot of memories of, you know, things that you would not

22  necessarily want to discuss in public.

23            So I don't anticipate quite that level of

24  private jury conferences today, but I just give you that

25  example.  But I want to assure you that, you know, these

1  lawyers are not trying to unduly pry, but at the same

2  time, if you have any hesitancy, because it's so

3  important that you give full and complete answers, just

4  say that's something I want to talk to Judge Ward about,

5  and we will be happy to discuss it with you.

6              With that instruction, I'm going to start

7  here.  Let's see, Mr. Hastings, do you have a

8  microphone?

9              You got it right there.  All right.  If

10 you'll stand and give this -- and after you give the

11 answers to these nine questions, just pass the

12 microphone right on down.

13             JUROR HASTINGS:  I live in Gilmer.  I

14 have two children.  I have retired from Mobil Pipeline.

15 I worked part-time as a mechanic in a lawn mower shop in

16 Longview.  I've been there about six years.  Worked for

17 Mobil 30 years.  I have a high school education.  I'm

18 divorced, and I have never served on a jury before.

19             JUROR MURRELL:  My name is Joseph

20 Murrell.  I live in Big Sandy, Texas.  I've got two

21 children, one grandson.  I work for Exide Technologies.

22 I drive a battery truck; I deliver batteries.  I've

23 worked there 20 years.  I finished high school.  My

24 wife's name is Brenda.  She works for SFG in Big Sandy,

25 and she's worked there 25 years.  And I have never been

1    picked for a jury.

2              JUROR MORTON:  Mark Morton.  I live in

3    Marshall.  Never been married, no kids.  I work in Tyler

4    at the Target Distribution Center probably about 10

5    years.  High school education.  Never served on a jury.

6              JUROR BLAKELEY:  My name is Clarence

7    Blakeley.  I live in Hallsville, Texas.  I have two

8    children.  I work at PPC Industries, police control

9    equipment.  I'm a project manager there.  I've worked

10   there for 32 years.  Kilgore College is my college I

11   went to.  My spouse's name is Gina Blakeley.  She works

12   for Harrison County Tax Assessor/Collector in

13   Hallsville.  And I have been on a civil jury.

14             JUROR LOWERY:  My name is Britannie

15   Lowery.  I live in Atlanta, Texas.  I have one son.  I

16   work at Ward Timbers, a family business.  I have been

17   there for six years.  We buy land and timber.  And I

18   have a bachelor degree from Baylor University.  My

19   spouse's name is Brett Lowery.  He works at Hanson

20   Brick, and he's been there for 15 years.  And I've not

21   done jury service.

22             JUROR DUNCAN:  My name is Hazel Duncan.

23   I live in Marietta, Texas.  I have four children and two

24   stepchildren.  I am currently unemployed.  My background

25   is in retail sales.  I've got two years of college, and

1  my husband's name is Larry Duncan.  He is disabled,

2  heavy equipment operator.  And I have not served on a

3  jury in several years.

4                  JUROR GENNINGS:  Good morning, Your

5  Honor.

6                  THE COURT:  Good morning.

7                  JUROR GENNINGS:  My name is J.F. Gennings

8  from Atlanta, Texas.  I have one son and two

9  grandchildren.  I'm fully retired now from Cooper Tire &

10 Rubber Company, Texarkana, Arkansas.  I worked in the

11 Technical Services Department there for most of my 37

12 years or so.  Two years of college.  Pretty much worked

13 my way up through the ranks there in that company.

14 My wife's name is Barbie, and she taught school at

15 Bloomberg High School for 29 years.  She's now retired.

16 And as far as prior jury service, I've served only on a

17 grand jury in Cass County last spring.

18                  THE COURT:  Hold it.  Let the clerk take

19 that microphone and go back down to the other end.

20                  All right.

21                  JUROR LAWRENCE:  My name is Oscar

22 Lawrence.  I have one daughter.  Worked for General

23 Motors for 28 years as an electrician.  I have four

24 years of trade school.  My wife's name is Cindy.  She

25 works for a company here in town, Celebrating Homes, as

```
 1  a -- I don't know -- in the Accounting Department doing
 2  something.  She's been there 13 years.  I have served on
 3  a civil jury.  Been several years, but I have served on
 4  one.
 5              JUROR BABIN:  I'm Randall Babin.  I have
 6  a daughter.  I am the Executive Director for Soda Lake
 7  Baptist Association here in Marshall.  Live in
 8  Hallsville.  I have served there 26 years and have a
 9  master's degree.  My wife's name is Marsha.  She teaches
10  third grade in Hallsville Independent School District.
11  She's been there for 11 years.  And I've served on a
12  grand jury.
13              JUROR MURPHY:  My name is Deborah Murphy,
14  and I have two children.  I'm employed at St. Michael's
15  Hospital, Texarkana, Texas.  I've been there for 26
16  years.  I have about a year and a half of college.  My
17  husband's name is Warren.  He's retired from Cooper
18  Tire.  He works at Wal-Mart now.  And I've never served
19  on a jury before.
20              JUROR RAWLINGS:  My name is Ronald
21  Rawlings.  I have two children, and I'm retired.  I
22  worked as an electrician for 15, 20 years, and I worked
23  before that and I was a lineman for the L.E. Myers
24  Company for several years in Longview and all over the
25  United States.  And I have a GED.  My wife's name is
```

1  Peggy.  And I've been on a civil jury one time.

2          JUROR POPE:  My name is Rhonda Pope.

3  I've never been married.  I have no children.  I have a

4  master's in business administration with a concentration

5  in management with an emphasis in quantitative methods

6  and statistics.  I was selected for a civil jury here in

7  federal court, but it dismissed.

8          JUROR BLASINGAME:  My name is Guylan

9  Blasingame.  I live in Gilmer, the Yamboree Capital.  I

10 have two grown children, two grandchildren.  I'm retired

11 from U.S. Steel Corporation, Texas operations, where I

12 worked there 39 years.  I'm a college graduate.  My

13 wife's name is Alice.  She was retired, but has recently

14 gone back to work.  She's a legal secretary and she

15 works for the Upshur County District Clerk's Office.

16 The only jury service is grand jury.

17         JUROR BRASHER:  My name is Hershal

18 Brasher.  I am from Bettie, Texas.  I have two children.

19 I'm retired from Union Pacific Railroad where I have 34

20 years as a TRM mechanic.  And I have a high school

21 education.  My wife's name is Kay, and she retired from

22 teacher's aide at Gilmer Elementary School.  And I was

23 on a criminal case a long time ago.

24         JUROR PATTERSON:  My name is Susan

25 Patterson.  I live in Hallsville.  I am married to Ricky

1 for 17 years.  We have two daughters.  I work for

2 Marshall Health Services here in Marshall as a medical

3 office manager.  My husband works for Capacity as a

4 machinist in Longview.  I've been with my job about a

5 year, and he's been with his about 10.  And I've never

6 been on a jury.

7 　　　　　JUROR MCNEEL:  My name is Richard McNeel.

8 I have two children.  I'm self-employed, contract

9 welding, and have been for the last 20 years.  High

10 school education.  Wife's name is Lisa.  She's also

11 self-employed.  She's a decorative painter.  I guess

12 she's done that for the last 20 years.  And I have not

13 served on a jury.

14 　　　　　JUROR JONES:  My name is Blanchie Jones.

15 I have three children and one stepchild.  I have 11

16 grandchildren and one on the way.  I work for Blue

17 Cross/Blue Shield.  I've been there 11 years.  And let's

18 see, my educational background is I have about three

19 years of college.  My husband's name is George Jones.

20 No, he's not the singer.  He is retired.  He used to

21 work at Gympac (phonetic spelling).  He was there for 13

22 years before he retired.  And, yeah, I've worked on

23 both -- both a criminal and civil case.

24 　　　　　JUROR ABRAHAM:  My name is Brenda

25 Abraham.  I am not married.  I work for BancorpSouth as

1  a customer service rep.  I have two years of college.

2  I've never served on a jury.

3              JUROR JORDAN:  My name is Billy Jordan,

4  and I'm from Waskom, Texas.  I have five children.  I'm

5  retired from General Motors Assembly Plant, Shreveport,

6  Louisiana.  I was there 26 years.  I graduated from high

7  school and have four years of college.  My spouse's name

8  is Tommie.  She also worked at General Motors, and she

9  is also retired with 23 years of service.

10             And let's see, I have served on a jury

11 and it was about a year ago.  It was criminal.

12             JUROR WEBER:  My name is Jackie Weber.  I

13 live in Jenkins, Texas.  I have two sons.  I was a

14 retired office manager for an insurance company.  I have

15 three years of college.  My husband's name is Gary, and

16 he is a retired mine manager from up in New Guinea.  And

17 I've never served on a jury.

18             JUROR REYES:  My name is Shirley Reyes.

19 I live in Waskom, Texas.  I have three children.  I work

20 at Wal-Mart.  Been there for 10 -- 9 years.  Previous

21 employment I worked for the school district for 14

22 years.  I have one year of college.  My husband's name

23 is Reuben.  He's retired from General Motors for 34

24 years.  And no prior service at all.

25             JUROR DURR:  Hello.  My name is Debra

Durr, and I live in Waskom, Texas.  I have one daughter

and one stepdaughter.  I work for Community Bank of

Louisiana in Bossier.  I have been at that office for 10

years for that company.  And I worked for First State

Bank in Waskom for over 10 years, prior to that.

            I have two years of college.  My

husband's name is John Durr.  He works for Eagle

Distributing in Shreveport, Louisiana, which is a

Budweiser distributor.  He has worked there for five

years.  He previously worked for another distributing

company.  I don't remember the name of it.  And I have

never served on a jury.

            JUROR HOLLOMAN:  My name is Patricia

Holloman.  I live in Hughes Springs.  I have three

children, three grandchildren.  I work for the Criminal

District Attorney's Office in Cass County.  I've been

there for 20 years.  I have an associate's degree.

My spouse's name is Marion.  He works for Dana

Corporation in Longview.  He's been there six years.

And I have never served on a jury.

            JUROR BIARD:  My name is Raymond Biard,

and I live here in Marshall.  I have two children.  I am

retired law enforcement, and I work for Prism Gas

Systems as a field tech.  I went to Marshall High.

            And my wife's name is Judy.  She is an

 1  office manager for a local doctor, and she's been there

 2  for about a year.  And I've never been picked for a

 3  jury.

 4             JUROR BOYCE:  My name is Pam Boyce.  I

 5  have two children.  I work for Atlanta Independent

 6  School District.  I live in Atlanta, Texas.  I am the

 7  administrative -- the principal and Director of the

 8  Behavior Unit there.  I have worked there -- this is my

 9  first year there, but I've been in education for over 20

10  years.  I have a master's degree from Texas A&M

11  University in Texarkana.

12             My spouse's name is Prince, and he's not

13  the singer either.  He's worked for Cooper Tire & Rubber

14  Company for the last 16 years.  Before that, he was a

15  manager at Brookshire's.  And, yes, I have served on a

16  criminal case.

17             JUROR NOLAN:  My name is Mary Alise

18  Nolan.  I've live in Gilmer, Texas.  I have three

19  daughters.  I work at Gilmer ISD as a sixth-grade

20  language arts teacher.  I am the lead teacher.  I have

21  worked there for 20 years.  I have my master's degree

22  from the SFA.

23             My spouse's name is Scott Nolan.  He is

24  self-employed as a contractor and he's done that for

25  over 28 years.  And I have never been on a criminal or

1  civil case.

2              JUROR THOMAS:  I'm Elizabeth Thomas.  I

3  work for Neiman Marcus.  I've been there for 11 years.

4  I am married.  I have two children.  My husband and I

5  have been married 30 years, and he works at Trinity

6  Industries.  And my children are grown.

7              JUROR FAILS:  I'm Dale Fails, and I have

8  two children.  Work for U.S. Steel.  Been there for 35

9  years.  Just high school and trade school and came up

10 there.  Not married.  I'm divorced.  And, yes, I've

11 served on two criminal trials.

12             THE COURT:  All right.  Ladies and

13 Gentlemen, thank you very much for your -- giving us

14 that information.  That will help us move along.

15             Mr. Albritton, are you going to address

16 the jury?

17             MR. ALBRITTON:  Yes, sir.

18             THE COURT:  I will give you a five-minute

19 warning.

20             MR. ALBRITTON:  Thank you very much, Your

21 Honor.

22             Good morning.

23             JURY PANEL:  Good morning.

24             MR. ALBRITTON:  Just like His Honor did,

25 since he had to suffer through telling us about

1  yourself, I'll tell you about me.  My name is Eric

2  Albritton.  I lived in Longview.  I've got two kiddos.

3  I've got a little boy that's 10 and a daughter who's 12

4  about to be 13.

5              I'm a lawyer.  I have a law firm in

6  Longview.  It's down on Tyler Street called the

7  Albritton Law Firm.  I've been practicing law by myself

8  since about 2000, and before that, I practiced with some

9  other lawyers.

10              My educational background is I grew up in

11  Rockwall, Texas.  I went to high school, Rockwall High

12  School.  I went to college at Baylor, and then I went to

13  law school out in California.

14              My wife's name is Michelle.  She's

15  actually my high school sweetheart.  She -- she's a

16  therapist; she's a play therapist, got a master's

17  degree, although she doesn't work outside the home right

18  now.  She's raising babies and analyzing me a lot.

19              I keep trying to remind her that she's

20  supposed to be a therapist for children and not adults,

21  but she doesn't listen to me much about that.  She

22  hasn't worked since Grace, our daughter, was born, and I

23  have never served on a jury before.

24              I introduced these folks with you -- with

25  me.  Bruce Saffran is the Plaintiff in this case.  Dr.

1 Saffran is a doctor.  He lives in Philadelphia,

2 Pennsylvania, and he's got a couple of boys.

3 　　　　　This is the most unusual part of the

4 case, and some of you have been on juries before.  This

5 is the only time you guys get to talk to us.  During the

6 course of the trial for whomever is seated as the jury,

7 lawyers will talk to you; witnesses will talk to you;

8 His Honor will talk to you.  You don't get to talk back.

9 This is your chance to talk back, and I encourage you to

10 do this, because it's a real important process.

11 　　　　　We're not trying to figure out if you're

12 fair people, okay?  I figure you're all fair people.  We

13 are trying to figure out if you're the right kind of

14 person to serve on this type of case, because we all

15 have our own life experiences.  Like I told you, I've

16 got these two little kids, okay, and if I was called to

17 jury duty and somebody wanted -- and the case had to do

18 with -- it was a criminal case and it had it to do with

19 somebody that intentionally harmed a child, well, I

20 would definitely not be the right kind of person for

21 that case based on my circumstances.

22 　　　　　Now, that doesn't mean I'm not a fair

23 person, because I think I'm a fair person.  So that's

24 what we're doing.  We're trying to figure out if, based

25 on your background and your circumstances, you're the

1  right kind of person to serve on this case.

2              So that's what we're doing.  And, you

3  know, all we really ask for is for you to tell us really

4  how you feel.  That's all we're asking for.  I mean,

5  everybody's got an opinion about something.  That's one

6  of the great things about America, right?  And we've got

7  lots of folks who worked at Cooper Tire.  So let me give

8  you an example about differing opinions.

9              Some folks think that collective

10  bargaining units, unions, are great things, okay?  Other

11  people, though, think, you know, I just don't think it's

12  really a good thing.  So let me ask you this:  Who's

13  ever been offered the opportunity to be in a union but

14  declined?

15              Yes, ma'am, what was -- yes, ma'am?

16              JUROR NOLAN:  Teachers union.

17              MR. ALBRITTON:  And is that Ms. Reyes?

18              JUROR NOLAN:  Ms. Nolan.

19              MR. ALBRITTON:  I'm sorry.  Ms. Nolan.

20  Okay.  Thank you very much, Ms. Nolan.

21              Now, are you Brent Goudarzi's sister?

22              JUROR NOLAN:  I am.

23              MR. ALBRITTON:  Well, I'm sorry to tell

24  that to everybody here, but thank you very much,

25  Ms. Nolan.

1                    THE COURT:  In defense of Mr. Goudarzi,

2   he's a well-known lawyer.

3                    MR. ALBRITTON:  And a friend of mine.

4                    JUROR NOLAN:  Good.

5                    MR. ALBRITTON:  And you know, some people

6   have got more opinions than other people.  You know,

7   like for instance, sometimes you drive down the road and

8   you see people that have got bumper stickers, and I'm

9   not talking about a parking sticker or something like

10  that, but a sticker that says -- in fact, His Honor, we

11  were in this courtroom one time and somebody told us

12  about a bumper sticker they had that said shut up and

13  drive.  We've all seen these people talking on their

14  cell phones.

15                   Who's got a bumper sticker on their car

16  that makes some sort of a statement about how you feel?

17  You know, that you're outspoken.  Anybody got a bumper

18  sticker on their car?

19                   All right.  Thank you.

20                   Now, in this lawsuit, there are two

21  Defendants.  The first Defendant is Johnson & Johnson.

22  Mr. Evans -- all right.

23                   The first Defendant is Johnson & Johnson.

24  It's a real big company, and it's got three divisions.

25  It's got a Consumer Division that's got 19 subsidiaries.

1   It's got a Pharmaceutical Division that's got 85

2   subsidiaries.  Then it's got a Medical Devices and

3   Diagnostics Division with 93 subsidiaries.

4               Mr. Evans, if you could put up the next

5   slide, please.

6               Now, I don't have time to go over all of

7   the Johnson & Johnson companies with you today, okay?

8   But what we've got here on the slide is that you can all

9   look at and take your time.  These are -- this is just a

10  smattering or an example of some of the companies in

11  Johnson & Johnson within their Medical Devices and

12  Diagnostics Division.

13              One of those companies you will notice

14  right here is Cordis Corporation.  Cordis is the other

15  Defendant in this case.  So the two Defendants are

16  Johnson & Johnson, this big conglomerate, okay, and then

17  Cordis, one of its subsidiaries.

18              Is anybody familiar with any of these

19  companies, Cordis or any of these other companies listed

20  on the screen?

21              Have you yourself or a close member, to

22  your knowledge, anybody ever worked for Johnson &

23  Johnson or one of these -- yes, sir, that's Mr. McNeel?

24              JUROR MCNEEL:  Yes.

25              MR. ALBRITTON:  If you would tell us

1  about that, Mr. McNeel.

2              JUROR MCNEEL:  I have an uncle out of

3  Little Rock, Neil Brown, electrical engineer.

4              MR. ALBRITTON:  Yes, sir.

5              JUROR MCNEEL:  Went to North Carolina to

6  start a new factory that they have there.  Under the

7  impression that they were going to move him up, and then

8  once he got the plant up and running, they denied.  He

9  was terminated.

10              MR. ALBRITTON:  Okay.  All right.

11              Anybody else have any experience with

12  Johnson & Johnson or any of these subsidiaries,

13  including specifically Cordis -- Cordis Corporation?

14              Anybody own any stock, to your knowledge,

15  in Johnson & Johnson?  The stock ticker is J&J.

16  Anybody, either you or your family members or close

17  friend own any stock in Johnson & Johnson?

18              All right.  Thank you very much.  You can

19  take that down, Mr. Evans.

20              Now, this is a lawsuit between Dr. Bruce

21  Saffran and Johnson & Johnson and Cordis Corporation.

22              I'm just going to refer -- throughout the

23  whole case, we're going to refer to them as Johnson &

24  Johnson and just keep it easier.

25              Anybody ever hear about this lawsuit

1  between Dr. Saffran and Johnson & Johnson before you got

2  here today?

3              I wouldn't expect that you would have,

4  but nobody's heard about that?

5              Now, there are a couple of lawyers here.

6  Mr. Sayles stood up and he's going to talk to you a

7  bunch in this case.  Mr. Sayles is from Dallas, Texas.

8  Mr. Diskant is from a law firm in New York called

9  Paterson Belknap.  It's got about a couple of hundred

10  lawyers.

11             And Mr. Sayles has got a partner who's

12  here in the courtroom -- if you could stand up -- Mark

13  Strachan.  Mark used to live here.  He practiced law in

14  Marshall, practiced law in Longview.  His wife is a

15  Marshall gal.  Lived here, you know, since high school

16  on.  Carla Strachan used to be Carla Cooper.

17             Does anybody know Dick Sayles, his

18  partner, Mark Strachan or Carla Strachan or Mr. Diskant

19  or anybody associated with that law firm of Patterson

20  Belknap?

21             All right.  Thank y'all very much.

22             Let me see a show of hands.  Who's

23  been either -- and when I say you, I'm talking about you

24  or a close family member or a close friend.  Who's ever

25  been a defendant in a lawsuit?  That means you or your

1 family member or something like that got sued by

2 somebody else other than a divorce?  I'm not talking

3 about divorces.

4                Anybody ever been a defendant in a

5 lawsuit?

6                Nobody's been a defendant in a lawsuit?

7                Let me back up for a second.  You know,

8 sometimes you see this on TV, and lawyers do this all

9 the time.  They're going to say, by your silence, I'll

10 assume you agree with me.  Well, I'm not going to assume

11 because you're quiet that you agree with me.

12                I'm asking you -- because there might be

13 lots of reasons you're not talking.  So talk to me about

14 what's going on and let me know if any of these

15 issues -- if any of this raises issues with you.

16                Raise your hand if you think there are

17 too many lawsuits.

18                All right.  Now, let me get your number.

19 All right.  Lots of folks think that there are too many

20 lawsuits.  I understand that.

21                And there are organizations out there

22 that are directly organized in response to that feeling

23 that lots of people have.  Like there's an organization

24 called East Texans Against Lawsuit Abuse.  Anybody ever

25 heard of that?

1                    Raise your hand if any of you are a

2    member of or have ever given money to East Texans

3    Against Lawsuit Abuse.

4                    Nobody?

5                    Now, everybody in the world, including

6    me, is against frivolous lawsuits.  We agree everybody

7    against frivolous lawsuits?

8                    All right.  And Judge Ward and other good

9    judges like him get rid of frivolous lawsuits.  And when

10   I say frivolous, what I mean is absolutely, positively

11   no merit, just should be thrown out, okay?

12                   There's some other lawsuits.  A

13   non-frivolous lawsuit is a lawsuit where there's a

14   legitimate dispute between people, okay?  So you've got

15   frivolous, no merit whatsoever, and then non-frivolous

16   where you've got a legitimate dispute against people,

17   and they just need it resolved by us, okay?

18                   Raise your hand, let me know who here

19   thinks that, you know, there are just more frivolous

20   lawsuits out there, those without any merit at all, than

21   non-frivolous lawsuits?  Anybody feel that way?

22                   And if you do, again, it's certainly

23   okay.  We just want to know about it.  Everybody wants

24   to know about that.

25                   Does anybody think that there's more

1  frivolous than non-frivolous lawsuits?

2          Okay.  Now, you know, we're talking about

3  lawsuits.  We think that -- lots of us think there's

4  just too many of them.  Some people think that, you know

5  what, if you've got a dispute with somebody, you've got

6  a dispute with a company, but, you know, you just ought

7  not to sue; it's not the right way for people to resolve

8  their problems.  And that's okay.  Lots of people think

9  that.

10          Now, there are folks on the other side

11  that say, you know what, in our culture and in our

12  society, there's really no other way to resolve a

13  dispute; some disputes need to be resolved through the

14  legal system.

15          What I'm wondering is, who on this panel

16  falls into that first category; you think, you know

17  what, no matter what happened, you just don't think

18  people ought to file lawsuits?  Does anybody feel that

19  way?

20          Let me ask you, Mr. Gennings, do you feel

21  that way, that, you know, folks just ought not to file

22  lawsuits --

23          JUROR GENNINGS:  No.

24          MR. ALBRITTON:  -- to address their

25  grievances.

1           JUROR GENNINGS:  I do not.

2           MR. ALBRITTON:  You do not feel that way.

3           What about you, Ms. Pope; how do you feel

4   about that?  Do you think that people, if they've got

5   disputes, that they ought to work them out in some way,

6   other than through the filing of a lawsuit?

7           JUROR POPE:  I think that -- I believe

8   that the proper way is to first address someone.  If

9   that isn't -- with the issue.  If that doesn't resolve

10  it, then you take another one.  And in our country, you

11  go through the process; you bring it before the body.

12  If that doesn't work, then at that point, we have the

13  legal system to address our issues and concerns.

14          MR. ALBRITTON:  Thank you very much,

15  Ms. Pope.

16          Mr. Babin, let me ask you.  How do you

17  feel?  Do you think that if folks have got a dispute

18  that, you know, it's a legitimate thing to file a

19  lawsuit, or do you think folks just ought not file

20  lawsuits?

21          JUROR BABIN:  If it's a legitimate cause,

22  then, yes, I think they have the right in America to use

23  the legal system to get justice.

24          MR. ALBRITTON:  Thank you very much,

25  Mr. Babin.

1          Now, let me ask you a related question,

2   and this might, you know -- I've actually heard this

3   from folks before, and it's good.  I mean, people can

4   certainly feel this way.

5          Some folks just kind of have a moral

6   opposition to somebody filing a lawsuit to ask for

7   money.  They just think, you know what, I would be good

8   on some things.  You know, there are some kinds of cases

9   I would be happy to deal with, but I just don't really

10  feel comfortable being called upon to award money

11  damages.  And this is a lawsuit that's going to involve

12  money damages.

13          Does anybody feel like, you know, you're

14  just probably not the right kind of person for this

15  particular case, because you'd be uncomfortable with

16  having to award money damages?  Anybody feel that way?

17          Now, Mr. Evans, if you would, put up this

18  next slide.

19          Now, Ladies and Gentlemen, I alluded to

20  this.  In this case, Dr. Saffran is going to be asking

21  for money damages.  He's going to say that Johnson &

22  Johnson used his property, his patented invention,

23  without permission, and they've made lots and lots of

24  money, okay, over it.

25          And so one of the issues in this lawsuit

1   and in all lawsuits is you have to figure out the right

2   damages.  And I'm showing you a formula here that

3   everybody agrees is the formula you use.  And at the

4   top, you've got a royalty base.  That's a -- that's a

5   phrase you're going to hear in this case.  And that's

6   the revenue, the amount of money a company has made

7   using somebody's invention.

8                   The next word you see there or the next

9   phrase is royalty rate.  That's a percentage.  So you're

10  talking about a percentage of revenue equals a

11  reasonable royalty.

12                  Now, Ladies and Gentlemen, in cases -- in

13  many patent cases, that top number, the revenue, is a

14  very big number, literally billions and billions of

15  dollars, like more than $5 billion.  I mean, that's hard

16  to -- at least for me, to sort of conceive of, but it's

17  a ton of money.

18                  And so no matter whatever rate you apply

19  by 5 or $8 billion, that's going to come up with a

20  really big number here on the bottom.

21                  And so in patent cases and lots of times,

22  you're talking about a situation where there are

23  literally hundreds of millions of dollars at issue.

24                  You know, most of us aren't, you know,

25  used to dealing with that kind of money, to say the

1  least.  I mean, talk about my kids call me Captain

2  Obvious.  Well, how about that for a Captain Obvious

3  statement?

4           I mean, we just -- it's beyond our

5  understanding, that kind of money.  And so some folks

6  think that, you know, it would just be really hard for

7  me or difficult to sit in a case, and then at the end of

8  the day, if the facts and circumstances warranted it, to

9  write in a number in the hundreds of millions of

10 dollars.

11          And that's okay, okay?  You know, some

12 folks feel that way.

13          Does anybody feel like, you know what, no

14 matter what the facts and circumstances are, I just

15 don't think I could ever award somebody a hundred, 200,

16 $500 million.  Does anybody -- yes, ma'am.  Ms. Lowery,

17 you feel that way?

18          JUROR LOWERY:  Uh-huh.

19          MR. ALBRITTON:  Okay.  And I'm not

20 surprised.  I'm not surprised.  That's not uncommon.

21          To other folks, you know, like

22 Ms. Lowery, you know what, no matter what the facts and

23 the circumstances in a case, I just don't think I can

24 write a number in a verdict form with that many zeros,

25 in the hundreds-of-million-dollar range.  Anybody else

1  feel like Ms. Lowery?

2             Mr. Lawrence, how about you; do you feel

3  like that in the right case under the right

4  circumstances you'd be able to write a number in a

5  verdict form that's got lots and lots of zeros, hundreds

6  of millions of dollars?  Is that something --

7             JUROR LAWRENCE:  Yeah, I believe I could.

8             MR. ALBRITTON:  You could?

9             JUROR LAWRENCE:  In the right case.

10             MR. ALBRITTON:  Yes, sir, in the right

11  case; that's right.

12             What about Mr. -- Mr. Blakeley, how do

13  you feel about that?  Are you sort of like Ms. Lowery

14  and that is, you'd just be under any circumstances --

15             Mr. Blakeley is No. 4.  Thank you.

16             JUROR BLAKELEY:  I never have thought

17  about it.

18             MR. ALBRITTON:  Well, as we're talking

19  about it, what do you think?  How does that strike you?

20             JUROR BLAKELEY:  I guess it would depend

21  on the merits of the case.

22             MR. ALBRITTON:  Yes, sir.

23             What about you, Mr. Gennings; how do you

24  feel about that?  Are you sort of in the same camp as

25  Ms. Lowery that --

1          JUROR GENNINGS:  No, I'm not.

2          MR. ALBRITTON:  You're not.  Thank you

3    very much, Mr. Gennings.

4          Now, you know, in this case, you see that

5    Dr. Saffran is the Plaintiff.  He's the person who owns

6    this patent.  And does it change anything, that if it's

7    a private person that's asking or that would be -- could

8    you award hundreds of millions of dollars to a private

9    person in the right kind of case?

10          Now, we're all -- you know, we live out

11    here and know lots of people who work -- I know lots of

12    people who work in the oilfield, okay?  I mean, pretty

13    common stuff.  I mean, this shale has been quite the

14    boom to people.  In fact, my office manager, her

15    husband, works in the oilfield.

16          And in oil and gas cases, if you're a

17    landowner and somebody takes -- comes in and drills a

18    well on your place or comes in and cuts your timber,

19    okay, you know, people pay for that.  It's like this --

20    it's a royalty.  So that's what we're talking about when

21    we're talking about damages in a case like this.  Paying

22    somebody for using their property.

23          Anybody on this panel, you, your family

24    member, or close friend, ever had a heart attack?

25          Let me get your numbers there.  That's

1  Mr. Bailey (sic), No. 4; Mr. Morton, No. 3; Mr. Murrell,

2  No. 2; Mr. Gennings, No. 7; Mr. Brasher, No. 14;

3  Mr. Blasingame, No. 13; and Ms. Pope, No. 12;

4  Mr. Rawlings, No. 11; Ms. Murphy, No. 10, Mr. Babin,

5  No. 9, 15, 17, 18.  Most of you, so I'm just going to

6  get your number.  I mean no disrespect.  20, 22, 25, 26,

7  27, and 28.

8              Let me ask you a little more focused

9  question.  Have you or your family member or your close

10  friend ever, as a result of having heart problems, had a

11  cardiac stent in implaced -- implanted?

12              All right.  Now, let me get that.

13              Mr. Murrell, Mr. Blakeley, Ms. Duncan,

14  Mr. Blasingame, Ms. Pope, Mr. Rawlings, Ms. Murphy,

15  Mr. Babin.

16              Then we've got Ms. Patterson, Ms. Jones,

17  Ms. Abraham, Ms. Durr, Ms. Weber, Mr. Jordan,

18  Ms. Thomas, Ms. Boyce, and Mr. Fails.

19              Anybody, to your knowledge, have a

20  cardiac stent that's made by or sold by Johnson &

21  Johnson?  The device at issue in this case is called

22  CYPHER.  It's Johnson & Johnson's cardiac stent.

23              Anybody -- anybody know if you or your

24  family member or your close friend ever had a Johnson &

25  Johnson stent?

 1                    Anybody know whether it was a

 2  drug-eluting stent, which is what CYPHER is, or a bare

 3  metal stent?  Is that the level of detail that you know?

 4                    Yes, ma'am, Ms. Jones?

 5                    JUROR JONES:  Uh-huh.

 6                    MR. ALBRITTON:  Is it drug-eluting or --

 7  yes, ma'am?

 8                    JUROR JONES:  Yes.

 9                    MR. ALBRITTON:  Who is it that had that?

10                    JUROR JONES:  My husband.

11                    MR. ALBRITTON:  Yes, ma'am, was that

12  recently?

13                    JUROR JONES:  A year ago January.

14                    MR. ALBRITTON:  Is he doing okay?

15                    JUROR JONES:  Yes, he is.

16                    MR. ALBRITTON:  My mom had one within the

17  last 12 months, too, so -- all right.  Thank you for

18  sharing that with us.

19                    Mr. Rawlings?

20                    JUROR RAWLINGS:  Yes.

21                    MR. ALBRITTON:  Was it a drug-eluting

22  stent or bare metal stent?

23                    JUROR RAWLINGS:  Three of them were.  One

24  of them was a metal.  The first one was a metal; the

25  other three was drug-eluting.

1              MR. ALBRITTON:  Drug-eluting.  And was

2  this you yourself or --

3              JUROR RAWLINGS:  Yes.

4              MR. ALBRITTON:  Yes, sir.  And about how

5  long ago did that happen?

6              JUROR RAWLINGS:  I think the last one was

7  '04.

8              MR. ALBRITTON:  Well, you certainly seem

9  to be doing well.  Thank goodness.

10              Do you know what kind -- do you know who

11  manufactured that stent?

12              JUROR RAWLINGS:  No, I don't have that on

13  me.  My wife keeps all that information in her purse.

14              MR. ALBRITTON:  Okay.  Thank you very

15  much, Mr. Rawlings.

16              Anybody else?

17              Let me see the hands of anybody that

18  directly or a family member or a close friend works in

19  the medical industry in any way.

20              Let me see your -- yes, sir,

21  Mr. Gennings, Mr. Rawlings, Ms. Murphy, Ms. Patterson,

22  Ms. Durr, Mr. Biard, and Ms. Holloman.  If -- well,

23  let's just go through one by one real quick and tell me

24  in what capacity you or your family members or friend

25  works in the medical field.

1              JUROR MURPHY:  My name is Deborah Murphy.

2  My sister is an RN, and I've been in St. Michael

3  Hospital for 26 years in different areas.

4              MR. ALBRITTON:  What do you do right now

5  at St. Michael's?

6              JUROR MURPHY:  Dispatcher/operator.

7              MR. ALBRITTON:  Okay.  Great.  And does

8  your sister work in cardiac medicine?

9              JUROR MURPHY:  She's been pretty much all

10  over.  She does dialysis now, but she have -- yes, she

11  has done that, too.

12              MR. ALBRITTON:  Okay.  Great.  Thank you

13  very much, Ms. Murphy.

14              Other folks in that, Mr. Rawlings?

15              JUROR RAWLINGS:  Yes, my sister-in-law,

16  she's an RN.  She works for Home Healthcare.

17              MR. ALBRITTON:  She does that here in

18  East Texas?

19              JUROR RAWLINGS:  Yes, the Longview area.

20              MR. ALBRITTON:  All right.  Has she ever

21  done any work with cardiac patients, to your knowledge?

22              JUROR RAWLINGS:  Not that I know of.

23              MR. ALBRITTON:  Okay.  Other folks over

24  here in the jury box?

25              Mr. Gennings?

1                    JUROR GENNINGS:  Yes, sir.  I have a

2    brother-in-law who's a physician in Atlanta, Atlanta,

3    Texas.

4                    MR. ALBRITTON:  Okay.  There in Cass

5    County?

6                    JUROR GENNINGS:  Cass County, yes.

7                    MR. ALBRITTON:  What kind of doctor is

8    he?

9                    JUROR GENNINGS:  He's a general

10   practitioner.

11                   MR. ALBRITTON:  An internal medicine

12   doctor?

13                   JUROR GENNINGS:  Atlanta Memorial in

14   Atlanta, just a general practitioner.

15                   MR. ALBRITTON:  Great.  Thank you very

16   much, Mr. Gennings.

17                   THE COURT:  Five minutes.

18                   MR. ALBRITTON:  Thank you, Your Honor.

19                   Some people love to talk about science

20   and chemistry and technical things, and, Mr. Gennings, I

21   know you were an engineer, so talking about technical

22   things might be easy for you.

23                   Raise your hand, if you're like I assume

24   Mr. Gennings is, and that is, talking about science and

25   engineering, those things are easy; they come, you know,

1  natural to you; you like that.  Raise your hand if

2  that's right.

3              Ms. Pope, No. 12.

4              Anybody else?

5              Science -- yes, sir, that's Mr. --

6              JUROR JORDAN:  Jordan.

7              MR. ALBRITTON:  I'm sorry.  Thank you,

8  Mr. Jordan.

9              Anybody else, science, engineering?

10             Yes, sir, Mr. Blakeley.

11             Anybody else like Mr. Blakeley, that's

12 science, engineering, those things are -- you know, come

13 easy to you and you like it and you enjoy it?  Anybody

14 else?

15             Thank you very much.

16             Now, some people, as you know,

17 Dr. Saffran has a patent.  And some folks think, you

18 know, inventions are just more likely to be -- come up

19 with by people that work for big companies.  Like

20 Johnson & Johnson, they've got research scientists and

21 all that.  Dr. Saffran is a private person.

22             Who thinks that -- raise your hands if

23 you believe that inventions are just more likely --

24 important inventions are more likely to be -- come up

25 with by folks that work for big companies as opposed to

 1  folks who work on their own?  Anybody feel that way?

 2            All right.  Final question:  Any of you

 3  ever -- or two more -- anybody ever been a foreman of a

 4  jury?

 5            Yes, ma'am.  That's Ms. -- Ms. Jones.

 6            Nobody else been a foreman of a jury?

 7            Now, you know yourself better than any of

 8  us, of course.  Anybody sitting there thinking:  You

 9  know what, if Mr. Albritton had just asked me the

10  following question, I would have told him something that

11  he would have thought was important?

12            So cut me some slack.  If I've missed a

13  question that you think's important or that you think

14  Dr. Saffran would like to know about or that you think

15  Johnson & Johnson would like to know about, would you

16  tell us about that?

17            Is there anybody out there thinking

18  there's some question that lawyer should have asked me

19  but didn't?

20            Okay.  Great.  Thank y'all very much.  We

21  appreciate it.

22            THE COURT:  Thank you, Mr. Albritton.

23            MR. ALBRITTON:  Thank you, Your Honor.

24            THE COURT:  All right.  Mr. Sayles.

25            MR. SAYLES:  May it please the Court.

1                    Ladies and Gentlemen of the Jury Panel,

2    at least if you look down the tracks, you can see the

3    caboose coming.

4                    I want to do as Mr. Albritton did and

5    tell you a little bit about myself, and then I'm going

6    to ask you some questions from the other side.

7                    You know, whether we're Dr. Phil fans or

8    not, as Dr. Phil says, no matter how flat you make the

9    pancake, there are two sides to it.  And we're going to

10   talk about it from a different perspective here in just

11   a moment.

12                   I live in Dallas now.  I used to live in

13   McKinney where I practiced law for 20 years.  I have

14   three grown sons.  I have a law firm in Dallas, and I've

15   been a trial lawyer for 36 years.  I have to wear these

16   glasses on account of being around that long, and I've

17   had the honor and the privilege of trying cases

18   throughout East Texas, and including in this very

19   courtroom on a number of occasions.

20                   I have a degree from Vanderbilt

21   University, undergraduate degree.  I played football

22   there.  I was the slowest lineman to ever play football

23   in the Southeastern Conference, a record I still hold.

24   And then I went to the University of Houston Law School.

25   My wife's name is Veronica.  She is retired after 21

1  years in marketing.  She is now staying at home and

2  working out and making plans.

3              Prior jury service, I've been on a couple

4  of panels, but they've never taken me.

5              So now let me start in with some

6  questions.  One thing that you have already observed is

7  the order in which a case like this will take place.

8  And Mr. Albritton, as you saw, went first.  He stood up

9  and announced first.  He got to make his voir dire

10  first, and that's decided by the rules of civil

11  procedure.  That's the way it is in every case.

12              Some psychologists write things that say

13  jurors who walk into a courtroom make up their minds in

14  the first 10 minutes.  Well, if you don't get to speak

15  for 30, you can see how that could be pretty concerning.

16  And everybody will say they will do it, but it's easier

17  said than done.  Will you keep an open mind until you

18  have heard both sides, the examination of the witnesses,

19  the cross-examination, the Plaintiff's witnesses, and

20  later the Defense witnesses?

21              It's a human instinct to make up your

22  mind pretty quickly when you size something up.  But in

23  a courtroom, it's really important to keep an open mind.

24              And I'm going to go way to the back of

25  the room back there, because I don't want to forget the

1  fifth row.

2                    Mr. Fails?

3                    JUROR FAILS:  Yes, sir.

4                    MR. SAYLES:  Can you see why I would be

5  concerned about the order that things go down in a

6  courtroom, since we go second, and would be wanting the

7  jurors to commit to keep an open mind?

8                    JUROR FAILS:  Yes, sir, I do.

9                    MR. SAYLES:  And if you were selected to

10 sit on this jury, will you do that?

11                   JUROR FAILS:  Yes, sir.

12                   MR. SAYLES:  All right.  Let me ask

13 somebody else.

14                   Mr. Biard, did I say that right?

15                   JUROR BIARD:  Biard (pronouncing).

16                   MR. SAYLES:  Biard (pronouncing)?

17                   JUROR BIARD:  Yes, sir.

18                   MR. SAYLES:  I didn't have any glasses

19 on.

20                   Mr. Biard, of course, you can see why I

21 would bring that up, right?

22                   JUROR BIARD:  Yes, sir.

23                   MR. SAYLES:  And am I right, that

24 oftentimes we, as human beings, kind of judge things

25 when we first see it?  That's a natural instinct?

1               JUROR BIARD:  Yes.

2               MR. SAYLES:  Now, in an important

3 proceeding like this, would you be able to take the oath

4 as a juror, which is an oath that you will keep an open

5 mind until you've heard it all?

6               JUROR BIARD:  Yes, sir.

7               MR. SAYLES:  Okay.  And can you

8 understand why I would bring that up?

9               JUROR BIARD:  Yes.

10               MR. SAYLES:  Okay.  Thank you very much.

11               Now, I'm going to ask the question this

12 way.  I think everybody can understand that, but is

13 there anybody that is already leaning, say, in favor of

14 Dr. Saffran just because of what you heard first?

15               Anybody?

16               Okay.  All right.  So when you're seated

17 in the soft seats of the jury box, we're going to rest

18 assured each day that you are waiting to hear what does

19 Mr. Sayles have to say and what does Mr. Diskant have to

20 say.

21               Now, we've talked about the technical

22 background, and my client's name is actually Cordis

23 Corporation.  It is in the family of Johnson & Johnson,

24 and I am very proud of that.  Johnson & Johnson has made

25 many products.  I'm sure everyone has used a Johnson &

 1  Johnson product.

 2            But here's my question:  Has anyone ever

 3  used a Johnson & Johnson product and had a bad

 4  experience?  Anybody?

 5            You know, if I was representing Chevrolet

 6  and somebody said, well, I had a lemon, I would want to

 7  know that.  So that's why I'm asking you now.  So I take

 8  it that everyone that's used those products, whatever

 9  they are, from band-aids to medical devices has not had

10  a bad experience.

11            Mr. Albritton asked you a question about

12  whether -- he asked whether you felt inventions were

13  usually made by big corporations.  And of course,

14  they're not always made by big corporations.  And he

15  pointed out that Dr. Saffran is an individual, which

16  indeed he is.

17            And my client, Cordis Corporation, and

18  Johnson & Johnson, no doubt about it, is a big

19  corporation in America.  I would be foolish if I did not

20  acknowledge that to you, because you all know it.

21            The law says that everyone, including a

22  corporation, is entitled to a fair trial at your hands

23  just like an individual.  So let's just look at it the

24  other way.

25            Since I represent a big corporation,

1  could you treat the big corporation as fairly as the

2  individual who brought the suit?

3              Ms. Abraham, how do you feel about that?

4              JUROR ABRAHAM:  I could be fair.

5              MR. SAYLES:  Okay.  And do you see how it

6  kind of works both ways?

7              JUROR ABRAHAM:  Yes, sir.

8              MR. SAYLES:  Okay.  Thank you.

9              Mr. Morton?

10             JUROR MORTON:  Yes, sir.

11             MR. SAYLES:  How do you feel about that?

12             You know, it's not -- when you go back to

13 the jury room, if it's that great big company against

14 that man and that's going to be influential to you,

15 now's the time I've got to hear that.

16             Do you understand?

17             JUROR MORTON:  I think I could treat them

18 both fairly.

19             MR. SAYLES:  Okay.  That's all I can ask

20 of you.

21             Now, let me just move on here.  I'm going

22 to ask you to search your heart and soul.  Is there

23 anybody who feels differently, who feels like that the

24 individual against a big corporation has the edge?

25             You know, we all pull for the underdog

1  all the time.  That's common.  But in a hall of justice,

2  that isn't right.

3              Anybody feel that way, that they would

4  lean toward the individual?

5              All right.  Thank you very much.

6              This is a patent case as you've heard,

7  and very simply stated, our defense is that this is a

8  very narrow patent.  It's not infringed by the Cordis

9  product, CYPHER.

10             And a separate question, the patent is

11  invalid, because there was information the Patent &

12  Trademark Office did not have.

13             And the third thing we're going to show

14  is that the damages are greatly exaggerated.

15             Now, in a nutshell, that's our position

16  in this case and what we're going to prove.

17             The Patent & Trademark Office issued

18  Dr. Saffran's patents.  He got it.  It was issued in

19  1997.  But the law says that the jury can look at

20  information, and they may be able to look at information

21  the Patent & Trademark Office did not have and determine

22  whether that patent should have been issued, whether it

23  was new, novel, and non-obvious.  A jury can do that

24  under the Constitution and the laws of this country.

25             Some folks might say, well, if a skilled

1  Patent Examiner took a look at this, who am I to

2  second-guess that?

3                  Well, in a court of law, you're called

4  upon to look at the very evidence and make that

5  determination.

6                  Mr. Lawrence?

7                  JUROR LAWRENCE:  Sir?

8                  MR. SAYLES:  Could you do that, sir?

9                  JUROR LAWRENCE:  Yes, sir, I believe I

10  could.

11                  MR. SAYLES:  All right.  And do you

12  understand, while I have your attention here -- and this

13  is for everybody, of course -- that sometimes the best

14  of people, under the best of intentions, mistakes are

15  made?  Agreed?

16                  JUROR LAWRENCE:  Yes, sir.  We all make

17  mistakes.

18                  MR. SAYLES:  Yes, sir.  And the Patent &

19  Trademark Office could make a mistake, and if you're on

20  the jury, you will look to see?

21                  JUROR LAWRENCE:  Yes, sir.

22                  MR. SAYLES:  All right.  Mr. Blasingame?

23                  JUROR BLASINGAME:  Yes, sir.

24                  MR. SAYLES:  You realize after a

25  week-long trial, if you were to go back in the jury

1  room, after hearing all the evidence, and decide the

2  case, because you don't want to substitute your

3  judgment, based on the evidence, for the decision of the

4  Patent & Trademark Office, that would be wrong?

5              JUROR BLASINGAME:  Yeah.  Absolutely.

6              MR. SAYLES:  All right.  And so if you're

7  on this jury, you will look at that evidence?

8              JUROR BLASINGAME:  I sure will.

9              MR. SAYLES:  All right.  Here's the

10  question, and it's going to be asked in a general way,

11  but it is, oh, so important.

12              Is there anybody on this panel that might

13  think, well, this is science; it's a technical field;

14  who am I to substitute my judgment for the Patent &

15  Trademark Office and base a decision on that as opposed

16  to the evidence in this case, brought out in this

17  courtroom?  Is there anybody that would do that?

18              Okay.  The area of lawyers and law firms,

19  I am very proud to be shoulder to shoulder with Greg

20  Diskant and his team from Patterson Belknap in New York.

21              Mr. Albritton is working with a law firm

22  in Washington, D.C., called Dickstein Shapiro, that has

23  hundreds of lawyers, so we're about even on that score.

24              Anybody know of the Dickstein Shapiro law

25  firm?

1                    All right.  Mr. Albritton talked about

2    the issue of damages, and I want to talk to you about

3    that for just a moment.

4                    We believe in this case that you're going

5    to conclude at the end that there are no damages, zero.

6                    And if you determine that the patent has

7    not been infringed, and that calls for a zero award,

8    could you do that?

9                    Ms. Lowery, how about that?

10                   JUROR LOWERY:  Yes.

11                   MR. SAYLES:  Could you go with zero on

12   that?

13                   JUROR LOWERY:  If that's what the

14   evidence says, yes, I could do it.

15                   MR. SAYLES:  If the patent isn't

16   infringed?

17                   JUROR LOWERY:  Correct.

18                   MR. SAYLES:  Or, on the other hand, if

19   the patent was invalid, could you do that?

20                   JUROR LOWERY:  Yes.

21                   MR. SAYLES:  You will get instructions

22   from the Judge on how you make that decision.

23                   JUROR LOWERY:  Okay.

24                   MR. SAYLES:  But if you decide on the

25   facts that it's invalid, you could come back with zero?

1                    JUROR LOWERY:  Yes.

2                    MR. SAYLES:  All right.  Is there anybody

3    that couldn't do that, could not come back with zero?

4                    Indeed, there are big dollars involved in

5    the gross sales of this product since 2003, but look at

6    both sides of the coin.

7                    Now, here's something I want to ask you

8    about.  And, Ms. Duncan, I'm going to ask you on this

9    one, too.

10                    Lawyers have a duty and an obligation to

11   their client to cover all the bases.  Does that make

12   sense to you?

13                    JUROR DUNCAN:  Sure.

14                    MR. SAYLES:  And as Mr. Albritton said,

15   one of the things that he is going to try to prove in

16   this case is big damages.  You heard that?

17                    JUROR DUNCAN:  Yes, sir.

18                    MR. SAYLES:  All right.  Now, as lawyers,

19   with an obligation to our client, we have to challenge

20   those numbers.  Does that make sense to you?

21                    JUROR DUNCAN:  Yes, sir.

22                    MR. SAYLES:  Now, in this case, we are

23   going to have a damage expert who is going to challenge

24   their damage expert --

25                    JUROR DUNCAN:  Uh-huh.

```
 1                 MR. SAYLES:  -- necessarily come up, as
 2   you might guess, with a lower number.
 3                 JUROR DUNCAN:  Uh-huh.
 4                 MR. SAYLES:  Make sense?
 5                 JUROR DUNCAN:  Yes.
 6                 MR. SAYLES:  All right.  Now, that number
 7   itself is a big number.
 8                 JUROR DUNCAN:  Uh-huh.
 9                 MR. SAYLES:  It's about $60 million
10   dollars, okay?  A big number.
11                 Here is my worry and my concern and my
12   question to you and everyone else:  You might say, well,
13   Mr. Sayles, if your client didn't infringe this patent,
14   why would you challenge those damages?
15                 If you bring out a damage expert witness,
16   aren't you saying you did something wrong?
17                 Can you see why I would be concerned
18   about somebody saying that back in the jury room?
19                 JUROR DUNCAN:  Yeah.
20                 MR. SAYLES:  They wouldn't have done that
21   if they hadn't done something wrong.
22                 Now, I am telling you now, as lawyers, we
23   have an obligation to touch the bases, and we will.  If
24   you take the oath as a juror, can you say that you will
25   consider that, along with all of the other evidence, and
```

 1  not decide just because we're challenging damages and

 2  putting out a number, we must have done something wrong?

 3                 Can you do that?

 4                 JUROR DUNCAN:  Yes, I can do that.

 5                 MR. SAYLES:  Mr. Babin -- 6, 7, 8 -- yes.

 6  I got that right?

 7                 JUROR BABIN:  Yes, sir.

 8                 MR. SAYLES:  All right.  You understand

 9  my concern?

10                 JUROR BABIN:  Yes, I do.

11                 MR. SAYLES:  Does it make sense to you?

12                 JUROR BABIN:  Yes, sir.

13                 MR. SAYLES:  If you were standing right

14  in my shoes, would you feel like you've got to cover the

15  bases?

16                 JUROR BABIN:  You bet.

17                 MR. SAYLES:  So if you're on (sic) the

18  jury room and you were to feel or someone were to say,

19  well, I'm going to decide they must be responsible,

20  because they brought damage evidence, would that be

21  right?

22                 JUROR BABIN:  That's not fair.

23                 MR. SAYLES:  Okay.  While you've got the

24  microphone, are you a trained minister?

25                 JUROR BABIN:  Yes, I am.

1          MR. SAYLES:  You have a very good voice

2 and very good command in the room, so I thought perhaps

3 so.

4          JUROR BABIN:  Thank you.

5          MR. SAYLES:  All right.  I'm going to

6 move on.  You've all got the point.

7          Is there anybody here now -- and now is

8 the time to declare yourself -- that would feel, because

9 we bring out damage evidence in response to their case,

10 we're admitting we did something wrong, that we infringe

11 the patent?

12          This is now or forever hold your peace,

13 because when you get back in the jury room, it is too

14 late.  And that would not be a proper basis upon which

15 to decide the case.

16          Anybody?

17          All right.  I want to talk for a minute

18 about the courthouse doors being open.  I think it's a

19 wonderful thing.  I agree with everything that

20 Mr. Albritton said, and I agree with all the show of

21 hands about the courthouse.

22          But I want to tell you this:  The

23 courthouse doors in civil cases are open to everyone.

24 Unlike in a criminal case, where the case is screened by

25 a grand jury, anyone can bring a civil case.  And if

1 Mr. Albritton implied, I will assure you he did not mean

2 to imply that Judge Ward has prejudged the facts of the

3 case.  You will be the sole judges of the facts of this

4 case.

5             Is there anybody that would feel, man,

6 we're in a federal courtroom; we are before an esteemed

7 Federal Judge who's been sitting since the year 2000

8 with distinction; we have an audience here of many

9 people, man, there must be something to this?  Anybody

10 feel that way?

11             Can you see why I would ask you that?

12             We've got to start out even.  And in a

13 civil case that's filed, you will be the judges of the

14 facts, and you will be the very first to hear some of

15 the details of these facts.  So I'm going to rely on you

16 to understand that.

17             And if somebody in the jury room says,

18 boy, there must be something to this, otherwise, it

19 wouldn't be here; Judge Ward would have thrown it out,

20 he will tell you in his instructions you are the judges

21 of the facts; he is the judge of the law.

22             Is that alright with everybody on the

23 front row?  Understood?

24             How about on the second?

25             How about over here on the first pew and

1 going back?

2         All right.  I'm going to talk about one

3 thing that I often do, when I'm representing a company

4 that's been sued, and that's the subject of objections.

5         Lawyers have duties that I've already

6 talked about, about covering the bases.  They also have

7 a duty to make objections during the trial, or sometimes

8 we're considered to have waived it when we didn't.

9         Objections can sure be annoying.  I mean,

10 we've all been to sporting events where the referee just

11 keeps calling fouls and, you know, you just want to see

12 the game played.

13         But I will tell you that from time to

14 time, it is incumbent upon us to stand up and make

15 objections.  The Judge will just call balls and strikes

16 as he sees them.  Some will be sustained; some will be

17 overruled.  And by his ruling, he's not suggesting

18 anything about that testimony, except whether it comes

19 in or does not come in.

20         Is there anybody that feels like it's

21 wrong or improper for a lawyer to object when he feels

22 it's his duty to do so?  Anybody?

23         All right.  I'll tell you, in England,

24 they have a different system.  They just put the witness

25 up in a chair, and the lawyers have to sit there and be

1 quiet while a witness testifies.  It's totally

2 different.  But that's not the way we'll be doing it

3 here.

4            You are to decide the case based on the

5 evidence that's brought to you here in the courtroom and

6 not by an internet search or any other outside source.

7            And I want to tell you now that the law

8 has some restrictions on the witnesses that can be

9 called.

10            The Plaintiff has expert witnesses who

11 will help you.  We have expert witnesses who will help

12 you understand these issues in this case, but someone

13 might say why don't we just bring that Patent Examiner

14 down here from the PTO --

15            THE COURT:  Five minutes.

16            MR. SAYLES:  -- and see what they have to

17 say, but the law will not permit that.

18            So what I'm asking you is, will you

19 decide this case based on the evidence that is allowed

20 in the courtroom from the witness stand and in the

21 documents that are admitted into evidence before you,

22 understanding that we can't call the Patent Examiner;

23 they can't; we can't?  Is that alright to everyone, to

24 you, as you sit over here?

25            Now, I want to just see a show of hands

1 on this.  It might sound like a strange question.

2                  Anyone that owns an electronic reader,

3 like a Kindle or an iPad, just hold your number up.

4 You know, where you get books on your little

5 electronics.

6                  No. 26.

7                  Anybody else?

8                  All right.  Kindle and iPad is not doing

9 too well over here.

10                  All right.  Is there anyone here that

11 loves to read for a hobby?  Hold your number up, and I'm

12 just going to call them out in the interest of time.

13 6, 7, 12, 11, 10, 9, 17, 15, 19, 24, 25, 26.  Thank you.

14                  Now, I have to read so much at work, I

15 don't really much like to read when I don't have to,

16 because I have to read these law books all the time and

17 things of that nature.

18                  Is there anybody here who would rather

19 not read?  There's nothing wrong with that.  Just would

20 rather -- let me tell you why I'm asking it.  I'm going

21 to rephrase it just slightly, because I think I have

22 enough time to do it.

23                  Some people are visual learners; some

24 people are reading learners and read the instructions.

25 Some people hear things, and that's their best learning

1 tool.  And, of course, we're all a mixture of those

2 things, but I want to ask the question this way:

3            Who feels like that their learning and

4 comprehension is based more on reading than it is on

5 hearing?  More on reading than it is on hearing?  I

6 realize it's a combination, but I want to know if that's

7 where you would lean.

8            No. 9, No. 17, No. 26, and No. 25.

9            Dr. Saffran is a doctor.  My doctor in

10 McKinney is Billy Boring.  I love him; I'd believe

11 anything he said.  I really would, because I've known

12 him a long time.

13            Is there anybody that feels like because

14 Dr. Saffran is an M.D. physician, he's a radiologist,

15 that he's more believable than any other ordinary person

16 on the street?  Anybody?  Because some of us put such

17 trust and confidence in our doctor, we feel they're more

18 believable.  Anybody feel that way?

19            Let me turn the question over.  It is my

20 job in this case to challenge his credibility, just like

21 it's Mr. Albritton's job to challenge the credibility of

22 witnesses that we bring forward.

23            In doing that, will anybody give an edge

24 to Dr. Saffran, because he's an M.D.?  That's all I'm

25 asking, because I have to challenge his credibility, and

1   I will in this trial.  Anybody?

2           All right. My time is about out.  I'm

3   going to ask the final thing.

4           Is there something I should have asked?

5   We can't ask all the right questions.  I'm asking the

6   same thing Mr. Albritton did.

7           Thank you so much for your patience and

8   your attention.  I look forward to investigating this

9   case right here in this very courtroom and bringing you

10  the evidence.  And after we have, I feel certain that

11  you'll return a just verdict.

12          Thank you very much.

13          THE COURT:  Thank you, Mr. Sayles.

14          Counsel, approach.

15          (Bench conference.)

16          THE COURT:  All right.  I have only one

17  possible challenge for cause, and she's got a scheduling

18  problem, so No. 5.

19          MR. ALBRITTON:  Yes, sir.  That's what I

20  have as well.

21          THE COURT:  The ones I marked for

22  scheduling problems are 5, 12, 13, 18, 22, 25, and 26.

23          Did anybody mark any additional ones?

24          MR. ALBRITTON:  That's all I had, Your

25  Honor.

```
 1                    MR. SAYLES:  No, sir.

 2                    THE COURT:  Now, y'all note Jurors No. 19

 3    and 20 are reversed in their names.

 4                    MR. SAYLES:  Yes, I saw that.

 5                    THE COURT:  Y'all caught that?

 6                    MR. ALBRITTON:  Yes, sir, we did.

 7                    THE COURT:  Okay.  I just wanted to make

 8    sure.

 9                    And this case -- well, it depends on what

10    I do on these excuses.  If I grant all the excuses,

11    which I don't know.  We're going to be down to about 25

12    or 26.  I'm just not sure.

13                    Okay.  Y'all step back.

14                    (Bench conference concluded.)

15                    THE COURT:  All right.  Ladies and

16    Gentlemen, I'm going to excuse you here in just a few

17    minutes, and ask you, except for those who have got a

18    scheduling problem that we've talked about, that's

19    Ms. Lowery, No. 5; Ms. Pope, No. 12; Mr. Blasingame,

20    No. 13; No. 18, Ms. Abraham; No. 22, Ms. Durr; No. 25,

21    Ms. Boyce, No. 26, Ms. Nolan.  Those numbers should

22    remain, and we will take you up one at a time.

23                    The rest of you are excused.  Be prepared

24    to come back in the courtroom at 11:40.  I will get to

25    you as soon as we can and get this jury seated.  I've
```

 1  got two more to select today, so I'm moving as fast as I

 2  can.

 3                    At this time, I will ask you to, except

 4  for the ones I just called, to leave the courtroom,

 5  leave your numbers in your seats, and then be ready to

 6  come back at 11:40.  Hopefully, we will get right to

 7  you.

 8                    Thank you.

 9                    LAW CLERK:  All rise for the jury.

10                    THE COURT:  Just go ahead.

11                    (Remaining jury panel out.)

12                    THE COURT:  All right.  Everyone please

13  be seated.

14                    Let's see.  Counsel, come up.

15                    And, Ms. Lowery, if you will come around.

16                    (Bench conference.)

17                    THE COURT:  Let's get the lawyers up

18  here.

19                    JUROR LOWERY:  Okay.

20                    THE COURT:  How are you today?

21                    JUROR LOWERY:  Fine.

22                    THE COURT:  Okay.  You have a scheduling

23  problem.

24                    JUROR LOWERY:  I have a 10-month-old in

25  daycare.  It closes at 5:30 in Cass County.  My husband

1  could possibly be there, if absolutely needed, but I

2  always pick him up.

3          THE COURT:  All right.  One thing the

4  Court wanted to ask you about was in answer to one of

5  Mr. Albritton's questions, you said you just didn't

6  think you could write $500 million down.

7          Now, I'm going to give you a little --

8  the Court is going to instruct you as to how to arrive

9  at a reasonable royalty rate.

10         JUROR LOWERY:  Okay.

11         THE COURT:  And, of course, you told, I

12  believe, Mr. Sayles you could write a zero down.  But if

13  following the Court's instructions I gave you about how

14  you calculate a reasonable royalty rate, okay, and

15  there's about 14 or 15 factors of things and it's based

16  upon the evidence that you hear, not just the experts

17  but a lot of different evidence, if you were to, say,

18  based on a preponderance of the evidence and listening

19  to the Court's instructions and considering only

20  evidence and the Court's instructions and you came to

21  the conclusion in that jury room, this case is worth

22  $552 million under these instructions, could you render

23  that verdict or not?

24         JUROR:  Yes, I could based on the facts.

25         THE COURT:  You could based on the facts.

1   I guess did the 500 million shock you at first?

2                JUROR LOWERY:  At first I thought he said

3   billions of dollars.  Billions is a lot.

4                THE COURT:  I will tell you that we've

5   had verdicts in this courtroom in excess of a billion,

6   but -- and I will manage to say it without stuttering.

7   That's about the best I could do.

8                Anyway, so --

9                JUROR LOWERY:  If the facts go that way,

10  I guess I could.

11               THE COURT:  And you would?

12               JUROR LOWERY:  Yes.

13               THE COURT:  And would you apply the

14  burden of proof; that is, that it's more likely true

15  than not?  If the scales tipped ever so slightly in

16  favor of it, you say it's 500 million and it's tipped

17  that way, you could do it?

18               JUROR LOWERY:  Yes.

19               THE COURT:  Okay.  Any questions from

20  Plaintiff?

21               MR. ALBRITTON:  No, Your Honor.

22               THE COURT:  Anything from Defendant?

23               MR. SAYLES:  No questions.

24               THE COURT:  Okay.  Thank you.  Be ready

25  to come back in at --

1                    JUROR LOWERY:  Okay.

2                    THE COURT:  -- 11:40.

3                    (Bench conference concluded.)

4                    THE COURT:  All right.  Who have we got

5    next?

6                    Ms. Pope, I think.  Ms. Pope was first

7    here.

8                    JUROR BLASINGAME:  Excuse me.

9                    THE COURT:  I will get to you in a

10   moment, Mr. Blasingame.

11                   (Bench conference.)

12                   THE COURT:  Good morning, Ms. Pope.  How

13   are you?

14                   JUROR POPE:  Good.

15                   THE COURT:  You indicated you had a

16   scheduling problem.

17                   JUROR POPE:  Yes, I do.

18                   THE COURT:  What's your problem?

19                   JUROR POPE:  We're closing on our house

20   on the 27th, but I don't know what time yet.

21                   THE COURT:  Where is the closing?

22                   JUROR POPE:  In Longview.  I could

23   request an afternoon, if you could be merciful.

24                   THE COURT:  Well --

25                   JUROR POPE:  I realize you have a big

1  pool to choose from.

2            THE COURT:  We have a lot of things going

3  on.

4            JUROR POPE:  Okay.

5            THE COURT:  Are you selling a house or

6  are you buying a house?

7            JUROR POPE:  Sold it and bought one.

8            THE COURT:  Sold and have bought?

9            JUROR POPE:  Uh-huh.

10            THE COURT:  Well, what -- is there

11  something that couldn't be postponed until the following

12  week?

13            JUROR POPE:  Yes, sir.  We have to be out

14  of the house that we're in.  We've already been in there

15  a month, because they've had trouble with the title and

16  everything getting it.  We have to be out on the 27th.

17            THE COURT:  You have to be out?

18            JUROR POPE:  Uh-huh.

19            THE COURT:  Under the contract is what

20  you're telling me?

21            JUROR POPE:  No, sir.  Out of the house.

22            THE COURT:  I know, but under the terms

23  of the contract?

24            JUROR POPE:  Yes.  Under the terms of the

25  contract, yes.

```
 1                  THE COURT:  Well, I have to take this up
 2  with the lawyers.
 3                  Any question from the Plaintiff?
 4                  MR. ALBRITTON:  None, Your Honor.
 5                  MR. SAYLES:  No questions.
 6                  THE COURT:  No questions.
 7                  JUROR POPE:  Okay.
 8                  THE COURT:  Okay.  I will take it up, but
 9  please be ready to come back in the courtroom at 11:40,
10  okay?
11                  JUROR POPE:  Okay.
12                  (Bench conference concluded.)
13                  THE COURT:  Mr. Blasingame, if you will
14  come around.
15                  (Bench conference.)
16                  JUROR:  Mr. Blasingame, how are you
17  today?
18                  JUROR BLASINGAME:  I'm doing very well,
19  Judge.
20                  THE COURT:  What's our problem?
21                  JUROR BLASINGAME:  I have surgery
22  Thursday, which I don't know -- if the trial was going
23  to be through by then, I'd be glad to serve on a jury,
24  but I'm scheduled to be operated on at 6:45 Thursday
25  morning.
```

```
 1                    THE COURT:  Would you like to keep that
 2  appointment?
 3                    JUROR BLASINGAME:  Yeah.
 4                    THE COURT:  All right.  This has been
 5  scheduled for some time?
 6                    JUROR BLASINGAME:  Yeah.  Yeah.
 7                    THE COURT:  Any questions from the
 8  Plaintiff?
 9                    MR. ALBRITTON:  No, Your Honor.
10                    MR. SAYLES:  No questions.
11                    THE COURT:  Be ready to come back in at
12  11:40.  I'll have to talk to the lawyers before you
13  leave.  Thank you, though.
14                    JUROR BLASINGAME:  I will, sir.
15                    (Bench conference concluded.)
16                    THE COURT:  Y'all come around just a
17  minute.
18                    Hold off on -- wait just a minute,
19  Ms. Abraham.
20                    (Bench conference.)
21                    THE COURT:  Before I forget the facts,
22  how do y'all -- no, no, I wasn't talking to you.  I was
23  talking about -- I was telling Ms. Abraham to just wait
24  a moment.
25                    Wait just a moment, please.
```

1          Now, I usually take these up when they

2  tell me about them, but how do y'all feel about these?

3  Start back with Ms. Lowery, before we forget it.  She

4  said she could have her husband --

5          MR. ALBRITTON:  She said she always picks

6  him up.  That's a good 30-minute drive or --

7          THE COURT:  Actually, it's longer than 30

8  minutes.  Atlanta is 30 minutes -- it's 40 minutes to

9  Linden, so it's another 10.  It's a 50-minute drive.

10          MR. SAYLES:  We can let her go.

11          MR. ALBRITTON:  We will agree to that.

12          THE COURT:  We've got enough jurors.

13  Without objection, I'm going to excuse her.

14          Now then, I don't know if Ms. Pope has a

15  contractual obligation.

16          UNIDENTIFIED ATTORNEY:  She's married, so

17  she gives her power of attorney to her husband or

18  something.

19          THE COURT:  Any objection to --

20          MR. ALBRITTON:  No objection.

21          MR. SAYLES:  No objection.

22          THE COURT:  Mr. Blasingame has got

23  surgery scheduled.

24          MR. SAYLES:  I think we've got to let him

25  go.

1                    THE COURT:  I do, too.

2                    MR. ALBRITTON:  We agree, Your Honor.

3                    THE COURT:  I just like to get those

4   taken care of.  If I have to get more contentious as we

5   go, but I think we have enough in that regard.

6                    (Bench conference concluded.)

7                    THE COURT:  All right.  Ms. Abraham, come

8   around please, ma'am.

9                    (Bench conference.)

10                    THE COURT:  Ms. Abraham, how are you?

11                    JUROR ABRAHAM:  I'm good.  On Thursday, I

12  was to have some testing done on my ears.  I can leave

13  here and see if I can reschedule it, but that's the only

14  thing I have on the agenda.  It's at 1:00 o'clock.

15                    THE COURT:  Okay.  It's testing; it's

16  not --

17                    JUROR ABRAHAM:  It's not major, just --

18                    THE COURT:  I know you would like to keep

19  it.

20                    JUROR ABRAHAM:  No, I don't mind trying

21  to get out of it.

22                    THE COURT:  Where is it scheduled?

23                    JUROR ABRAHAM:  It's here.

24                    THE COURT:  Here in town?  Well, we won't

25  be able to recess Court, but maybe -- I think you can

```
 1  reschedule.

 2              JUROR ABRAHAM:  I probably can.

 3              THE COURT:  Thank you.  I appreciate your

 4  willingness to serve.

 5              (Juror Abraham out.)

 6              THE COURT:  I didn't even have to get

 7  contentious.

 8              (Bench conference concluded.)

 9              THE COURT:  All right.  Ms. Durr.

10              (Bench conference.)

11              THE COURT:  Ms. Durr, how are you?

12              JUROR DURR:  I'm good.

13              THE COURT:  What's the problem?

14              JUROR DURR:  I have a procedure scheduled

15  for today, but I canceled it for next Friday.  And I

16  have another -- I have something scheduled for Thursday

17  and Friday.  I have a mammogram Thursday, then I have

18  another female procedure for Friday.

19              THE COURT:  Any questions from the

20  Plaintiff?

21              MR. ALBRITTON:  No, sir.

22              MR. SAYLES:  No questions.

23              THE COURT:  Be back in here at 11:40.

24  Let me talk to the lawyers.

25              JUROR DURR:  Okay.
```

```
 1                    THE COURT:  Thank you.  Be ready to come

 2  back in then.

 3                    (Juror Durr out.)

 4                    MR. SAYLES:  Let her go.

 5                    MR. ALBRITTON:  We have no objection,

 6  Your Honor.

 7                    THE COURT:  Okay.  She's out.

 8                    (Bench conference concluded.)

 9                    THE COURT:  Ms. Boyce.

10                    (Bench conference.)

11                    THE COURT:  Ms. Boyce, how are you?

12                    JUROR BOYCE:  I'm good.  How are you

13  doing?

14                    THE COURT:  Good.

15                    JUROR BOYCE:  My uncle died, my daddy's

16  brother.  His funeral is Tuesday in Dallas.

17                    THE COURT:  Any questions from the

18  Plaintiff?

19                    MR. ALBRITTON:  No, sir.

20                    THE COURT:  Any from the Defendant?

21                    MR. SAYLES:  No questions.

22                    THE COURT:  Okay.  Thank you.  Be ready

23  to come back in at 11:40.  I will have to talk to these

24  lawyers.  You'll know about 11:00 -- around 11:40 what

25  we're going to do.
```

1              JUROR BOYCE:  Thank you.

2              (Juror Boyce out.)

3              MR. ALBRITTON:  We have no objection.

4              THE COURT:  Any objection?

5              MR. SAYLES:  No objection.

6              THE COURT:  Okay.  I'm not going to tell

7   her we weren't going to let her go to her uncle's

8   funeral.

9              (Bench conference concluded.)

10             THE COURT:  All right.  Ms. Nolan.

11             (Bench conference.)

12             THE COURT:  This is the last one, isn't

13  it?

14             MR. SAYLES:  I believe it is.

15             THE COURT:  This is the last one -- wait

16  just a minute.  How many have we excused?

17             MR. DISKANT:  One, two, three, four, five

18  (counting).  Five, yes, sir.

19             THE COURT:  Ms. Nolan, what's your

20  problem?

21             JUROR NOLAN:  I've got several.  My

22  husband's aunt, they're taking her off of life support.

23  She's about to pass away.  We're very, very close to

24  her, and her funeral will be within the next three days.

25  I'm also the lead language arts teacher for my district.

1  The other teacher is out on maternity leave, and I'm it.

2  She's not going to be back till February, and it's

3  tough.

4          Also -- this is something you've probably

5  never heard -- my daughter, Liz, National Hereford,

6  she's a senior.  We have a Fort Worth Livestock Show.

7  It begins next week, and I really do not want to miss

8  her doing that.

9          THE COURT:  I've heard the Fort Worth

10 Livestock Show.  I've been there many times.

11          JUROR NOLAN:  My husband is the president

12 of the Texas Hereford Association, so it's really a big

13 deal to our family.

14          THE COURT:  Okay.  Let me take that up

15 with all the lawyers.

16          JUROR NOLAN:  I appreciate that.

17          THE COURT:  And be back at 20 till.

18          (Juror Nolan out.)

19          MR. ALBRITTON:  No objection, Your Honor.

20          THE COURT:  We don't get to her.  We

21 don't get to her, I just realized.

22          MR. DISKANT:  Do we have enough?

23          THE COURT:  Well, let me see.  Okay,

24 you've got 10 jurors -- 10 jurors and 8 strikes; that's

25 18.  Then you start adding.  I think before we got to

1 Ms. Boyce, we did -- we could have stopped, because we

2 excused one, two, three, four (counting).

3                    MR. DISKANT:  Five, I think.  Oh, before

4 Ms. Boyce, yes.

5                    THE COURT:  Okay.  So you just strike

6 down through --

7                    MR. ALBRITTON:  Reyes, 21.

8                    THE COURT:  No.  I struck four, right?  I

9 excused four -- well, wait.

10                    Let me look one more time.

11                    MR. DISKANT:  Take 6 out and we've got

12 22.

13                    THE COURT:  No.  No -- okay.

14                    MR. DISKANT:  Oh, I'm sorry.

15                    THE COURT:  You just strike down through

16 No. 21.  You don't get to No. 22.

17                    MR. ALBRITTON:  Right.  Yes, sir.

18                    THE COURT:  Because I have excused --

19 before 21, I've excused 5, 12, 13.  We did not excuse

20 No. 18.

21                    MR. DISKANT:  5, 12, 13, correct.

22                    THE COURT:  And so -- you've got 10

23 jurors, 8 strikes, so the max is 21.  So we don't even

24 have to consider 22.

25                    MR. DISKANT:  Good.

1            THE COURT:  So if you'll take your

2   strikes between -- don't take anything below 21, four

3   each.  Have your strikes back to -- y'all know where you

4   are pretty much, I think, but do you need more than 15,

5   17, 18 minutes?

6            MR. ALBRITTON:  No, sir.

7            THE COURT:  Y'all get your strikes back

8   to Ms. Andrews by 20 till.

9            MR. SAYLES:  Yes, sir.

10            THE COURT:  After you've turned them into

11   Ms. Andrews, immediately notify each other of the

12   numbers.  And if you have any type of challenge, let me

13   know immediately.

14            MR. DISKANT:  And we're just going to

15   consider Billy Jordan, No. 19, now and No. 20 --

16            THE COURT:  Yeah.  I mean, y'all strike

17   them by the way their named.  But they were seated --

18   Jordan was seated as No. 19 and Weber was seated as

19   No. 20.  So exercise your strikes as they are numbered

20   here, but I just want to make sure y'all were clear, in

21   other words, based on the names based on the information

22   they gave you.

23            MR. ALBRITTON:  Your Honor, may we use

24   the jury room?

25            THE COURT:  Well, somebody could use

1  the -- is it unlocked?  And then you've got an attorney

2  conference room back here.

3                    COURTROOM DEPUTY:  She is letting them

4  meet in there.

5                    THE COURT:  She's letting them gather

6  there.  Can you just use, then, just here, and we will

7  let them use the attorney conference room?

8                    MR. ALBRITTON:  Yes, sir, that's fine.

9                    THE COURT:  There's people here, but I

10  think y'all can be quiet enough.

11                    MR. ALBRITTON:  Yes, sir, I think so.

12                    MR. SAYLES:  Thank you, Judge.

13                    THE COURT:  Y'all get those back.  We'll

14  try to get the jury back in here as quickly as we can.

15                    LAW CLERK:  All rise.

16                    (Recess.)

17                    LAW CLERK:  All rise.

18                    THE COURT:  All right.  Please be seated.

19  All right.  Ladies and Gentlemen, listen carefully and

20  please come forward and take a seat in the jury box.

21                    Ms. Andrews.

22                    COURTROOM DEPUTY:  Sidney Hastings,

23  Joseph Murrell, Mark Martin, Hazel Duncan, Oscar

24  Lawrence, Deborah Murphy, Susan Patterson, Blanchie

25  Jones, Brenda Abraham, Billy Jordan.

 1                    (Jury seated.)

 2                    THE COURT:  Ladies and Gentlemen, those

 3   of you who were not selected, I'm about to dismiss you.

 4   We've got these two other juries to pick today.  I want

 5   to thank you, and, again, I want to apologize to you

 6   again.  You know, United States District Judges

 7   generally don't run around apologizing, because we're

 8   lifetime appointments.  But you have my sincere apology

 9   for the manner in which you were first admitted to the

10   courthouse this morning.  That's all I can do at this

11   stage.

12                    So you do a great service, though, by

13   being here.  Even though you were not selected, the

14   system simply will not work unless we have more than are

15   going to serve, because that's the way the system is set

16   up.

17                    You've done your country a great service,

18   and I hope that you will come again -- or when you're

19   summonsed again by myself or some -- my successor, that

20   my only instruction is that you come with the same great

21   attitude when you win our lottery.

22                    Thank you very much.  You're excused at

23   this time.  Y'all are excused.  Thank you very much.

24                    (Jury panel out.)

25                    THE COURT:  Counsel, I will need you up

```
 1  here just a minute.  Less than a minute, I promise.
 2                  (Bench conference.)
 3                  THE COURT:  I know I told y'all to be
 4  ready to give opening statements, but this is Friday.
 5  You know, we're not going to get to these people to keep
 6  them here till 5:30 or so.  I think I'm going to ask
 7  them to -- you know, if we need to make up the time,
 8  we'll just have to make it up during the week, or come
 9  in one morning -- a couple of mornings at 8:00 or
10  something.
11                  Is there any problem with that?
12                  MR. SAYLES:  I have no problem with that.
13                  MR. ALBRITTON:  No, Your Honor.
14                  THE COURT:  I just think opening
15  statements would be unfair to both sides and to the
16  jury, okay?
17                  MR. ALBRITTON:  Yes, sir, it is.
18                  THE COURT:  All right.
19                  (Bench conference concluded.)
20                  THE COURT:  Please be seated.
21                  All right.  Then those of you that have
22  been selected, if you'll stand at this time, and take
23  the oath as jurors that Ms. Andrews will administer.
24                  Ms. Andrews.
25                  COURTROOM DEPUTY:  Thank you, Your Honor.
```

1  Please raise your right hands.

2              (Jury sworn.)

3              THE COURT:  Please be seated.

4              Ladies and Gentlemen, you now constitute

5  the jury in this case, and the Court's going to change

6  the schedule to the extent that rather than keeping you

7  here until late this afternoon and maybe till dark,

8  since I've got two more juries to select, I'm going to

9  go ahead, and in a few moments, we're going to excuse

10  you.

11              We'll just come back and we'll crank up

12  at 8:30 on Monday morning.  And so that will give you at

13  least Friday afternoon off here.  And we might have to a

14  couple of mornings come in at 8:00 o'clock rather than

15  8:30, but I think that would be better than y'all

16  spending Friday afternoon waiting to get to you.

17              So there's a couple of things that I need

18  to emphasize to you.  You've heard no evidence in this

19  case, and you've got to decide this case on the evidence

20  you hear.  And it's so important that you keep an open

21  mind, because not only do you decide this case on the

22  evidence, but you do decide, based upon the law as I

23  will instruct you, and that will be the last thing you

24  hear in this courtroom before you go in there to

25  deliberate.

1          So please keep an open mind as you go and

2    do that, just sort of -- that's something you sort of

3    need to think about, because it is a natural reaction.

4    Always sort of start making up your mind before you've

5    heard everything.  That's something that a judge has to

6    work hard at not doing, so it's not always easy, but

7    please do that.

8          Now, you're going to go home this weekend

9    or this afternoon and you will see friends and family,

10   and you're going to be asked what are you doing.  Of

11   course, I'm about to serve on a jury down in Federal

12   Court in Marshall.

13         My experience in the last 40-plus years

14   has taught me that the first question that your friend

15   or family is going to say is, what kind of case is it?

16   I'm instructing you don't answer that question, and

17   here's the reason why.

18         The moment you answer that question,

19   they're going to say, more than likely, you know, I know

20   something about a case like that, or, you know, I heard

21   about a patent case.  And you just don't need to hear

22   that.  That's something that might affect you.

23         So please, please do not discuss the case

24   or even what kind of case it is or anything about who's

25   involved, because that would be inappropriate.

1          Now, the other thing is I want you to be

2   thinking about, and I want you to follow this

3   instruction, is that you're not to do any type of

4   research about these companies, the parties to this

5   lawsuit or this device, this CYPHER device that's been

6   mentioned.

7          Do not get on the internet or try to

8   consult any type of books, anything to check about

9   anything about this lawsuit or these companies, because

10  that would be totally improper.

11         You've got to decide this case based

12  solely upon the evidence you hear and in accordance with

13  my final instructions to you.

14         Now, Monday morning, I'll give you some

15  preliminary instruction, but then you'll get my final

16  instructions.  You've got to wait till all of this is

17  done.

18         The other thing is, I don't know whether

19  any of you are social networkers on your telephones or

20  not, but you've got to keep in mind that you can't

21  during the course of this trial, at breaks or lunchtime,

22  going out and texting people about what's going on in

23  this case or talking to them on the phone.

24         We have had the experience, not in this

25  Court but not too far from here, of jurors that were

1    just sort of hooked on using that telephone and texting

2    messages back and forth.  And what happens is, you know,

3    you spend a week in trial and all this money from the

4    lawyers and their clients presenting their evidence, and

5    then it comes out somebody's been -- may have been

6    improperly influenced by somebody outside the courtroom.

7    And so what happens is you get a new trial and all the

8    money and time of everybody is wasted.  And so please do

9    not do that.  Keep that in mind.

10                   I want you to have a safe weekend, and I

11   will see you back.  We'll be ready to go promptly at

12   8:30 on Monday morning.

13                   Thank you.  You may leave the courtroom

14   at this time.

15                   LAW CLERK:  All rise for the jury.

16                   THE COURT:  You will follow Ms. Anderson

17   right here.

18                   (Jury out.)

19                   THE COURT:  All right.  Please be seated.

20                   Anything from the Plaintiff at this time?

21                   MR. ALBRITTON:  Not at this time, Your

22   Honor.

23                   THE COURT:  Anything from the Defendant?

24                   MR. SAYLES:  Not at this time, Your

25   Honor.

1        THE COURT:  Okay.  Counsel, now remember,

2   we want the juror notebook on Monday morning that

3   contains at least the patent-in-suit and taking the

4   claim construction that the Court has given, just the

5   actual definitions and that -- and if you've got a

6   glossary.

7        MR. ALBRITTON:  Yes, sir.

8        THE COURT:  That's a minimum.  If y'all

9   want to stipulate as to anything else that you want to

10  put in there by agreement, you may do so.

11       Any questions?

12       MR. ALBRITTON:  No questions.

13       MR. SAYLES:  No questions.

14       THE COURT:  All right.  Thank you for

15  being here.

16       Before I dismiss you, I just want to tell

17  the lawyers from LaserDynamics, as soon as we get this

18  jury in here, we'll go forward.  And I'd like to excuse

19  this counsel, and while I'm getting the jury in, if the

20  counsel for Laser Dynamics will approach, please.

21       (Court adjourned.)

22            *      *      *      *      *

23

24

25

1

2                            CERTIFICATION

3

4            I HEREBY CERTIFY that the foregoing is a

5    true and correct transcript from the stenographic notes

6    of the proceedings in the above-entitled matter to the

7    best of my ability.

8

9

10

11   /s/_____              _____

     SUSAN SIMMONS, CSR                    Date
12   Official Court Reporter
     State of Texas No.:  267
13   Expiration Date:  12/31/12

14

15

16   /s/_____                _____

     JUDITH WERLINGER, CSR                 Date
17   Deputy Official Court Reporter
     State of Texas No.:  731
18   Expiration Date  12/31/12

19

20

21

22

23

24

25